Argument not to exceed 15 minutes per side. Mr. Wildenborg, you may proceed for the appellant. John Wildenborg, appearing on behalf of the U.S. Department of Justice. The claimant's name is Karen Engbrecht. Ms. Engbrecht's case is primarily based on the strength and thoroughness of the opinions of her treating physicians, specifically psychiatrist Dr. McArthur and therapist Ms. Hastings. Is the therapist the treating physician? Pardon me? Does the therapist count as a treating physician? No, she's another source. So you started by saying the strength of your client's case in terms of the forcefulness of the treated physicians, plural. You used plural, and then you mentioned a therapist, and then we have this thing about Dr. Nicholson. Dr. Nicholson, correct. And so Dr. Nicholson doesn't seem to have been too engaged. I'm not sure if she counts as a treating physician. Don't you agree? That's probably right, Your Honor. Okay. What we have is he is, let me have a therapist, and how does that work? She is another acceptable medical source, which under the Social Security regulations indicates that they must consider that and that – Does it get the same demanding level of consideration the treating physician does than our treating physician would? Not the same, Your Honor. Okay. It's a lower level, but it's still – the regulation indicates that – recognizes that the therapist plays a significant role in health care treatment and that there has to be substantial attention paid to their decisions or to their opinions. But yeah, I stand corrected, Your Honor. There is a treating physician psychiatrist, Dr. Nagarkar. There's a treating therapist, Ms. Hastings. There is Dr. Nicholson. Now, Dr. Nicholson is not mentioned in the ALJ decision, so whether he's treated or not, it's still a psychiatrist's opinion concerning her limitations, and the ALJ does not address that. Well, let me ask you, the ALJ and the vocational expert in this case adopted all the limitations the medical providers have placed on the claim. Wouldn't you agree? In other words, she couldn't work around the public. She had to have little time to supervise. It had to be low-stress work, light duty, no heavy lifting. The vocational expert assumed all that instead of the ALJ. That's correct, Your Honor. Except when you get to the specific opinions. Right. The opinions, they did the ALJ disagree. And as you – and I'm willing to credit – if we go even back to Dr. Nagarkar, I think you can fairly read his opinion to say she shouldn't work at all. Correct. But that under the treating physician rule, that gets you to the first base. But now the ALJ either accepts that opinion or has to give a recent explanation. Correct. And there are many, many reasons given why you object to that. You spent quite a bit of time in the opinion going over why you didn't accept the conclusion. No, I think there's really one basic reason. The judge did not agree with it. And on page 59 of the record, the ALJ refers to the dogged pursuit of these activities, meaning parole or blading or outside activities. These activities rely on a degree of capability which outstrips the level of functioning or trait in her treating practitioner's letters. That's the supposed good reason for rejecting the opinion. It's one. Well – He says all that. And also her activities that they deliver, what she does on basic – I think the question that he addressed that the medical providers didn't, they all agreed that her prior work, full-time work, was out of the question. So she couldn't go back. She couldn't go back to earlier jobs to perform. But she had some part-time jobs where she stacked boxes and unloaded packages. And there's not many that the ALJ focused on. That's the kind of work she could still do. She did a temporary part-time job around Christmas. Therapist Hastings, in one of her letters, gives the opinion that I don't see any way she'd go back and do any significant work part-time or full-time. That's – What's the reasoning behind that? Pardon me? What's the reasoning behind that given the fact that she has that part-time job, she does have all these activities? Go ahead. Yeah. The reasoning – if I can pull out one of Ms. Hastings' – Okay, I said the most defensible reasoning. That's what I mean when I say that. What's the most defensible reasoning for that conclusion? It's Ms. Hastings' description of what actually happens when she's in the workplace. And this is on her letter of October 26, 2009. That's page 247 of the record, where Ms. Hastings says, I do not believe Karen will ever be able to function in the workplace, even if she found another part-time job. I would predict she will hit a wall, be unable to perform her duties as expected. And then she goes on. She has an impaired ability to function socially. She's easily intimidated with coworkers and customers. She is sensitive to criticism, lacks self-confidence after clarification when she doesn't understand what's expected of her. She makes mistakes and feels overwhelmed. And then she has even more difficulty maintaining concentration and the pace that is expected of her. I mean, there you have a very lengthy narrative explanation of the psychiatric symptoms that she has and what she undergoes in the workplace. And this is a therapist who has been treating her since 1990. There are different types of workplaces. There are workplaces where you don't work with a lot of other employees and you don't interface with customers. So it just seems like a pretty sweeping generalization that might well apply to some work environments, but not all of them. Well, we're dealing here, I would submit, with a medical opinion. The psychiatrist, Dr. McGonigal, and the therapist, Ms. Hastings, testify or express the opinion. These would apply in any situation, in any workplace. That's a medical conclusion. We're not dealing with credibility here. We're not dealing with clients who claim it's a secretion of their symptoms. We're dealing with what the doctors state. And the question is, is there any medical opinion in the record that says, okay, we see these limitations. There's some other work that she can do. There is no medical opinion in the record that says that her symptoms would allow her to work in any situation. Whether we apply the opinion positionable or not, we have the other medical evidence we'll provide. We've got some evidence from a provider who says she can't do any work at all. Your view is there's no doctor of records that competes with that. That's correct, Your Honor. And there's also no other – I mean, the argument the commissioner can make is there's other substantial evidence. But the substantial evidence that the ALJ was considering are things that the therapist and the psychiatrist also took into account. The – Let me go back for a minute. There's some evidence back in the 90s and there that she could do light work without stress. Well, yeah, and she was employed for 20 years with the county. Until 1999. Pardon me? Until 1999. I believe until 1997. But she was – if you're interested in Dr. Nekarkar's records, she was struggling even throughout her employment situation. The fact of the matter is there are at least, on the record, three different positions she held in the county. So there's a suggestion here that she's moving on because she's having problems with these positions. She's a clerk typist from 1991 to October 1993, a typist two, then a clerk typist one with a pay cut in a different department October 1993 to December 1994, and then she's a clerk typist two from September 1994 to October 1997. But during that last work period, she has a psychiatric hospitalization in July 1996. She's off work until October or November of that year. And Dr. Nekarkar's records indicate that even though she does go back to work for several months before she gets her disability retirement, she goes for an ECT, electroconvulsive therapy, evaluation by a Dr. Hunt. And Dr. Hunt recommends she should undergo ECT. That denotes a very significant struggle in terms of trying to stay employed. I mean, she did stay employed even though the therapist recognized that she was having these psychological struggles for a long period of time. So the work history, I think, indicates evidence that she is certainly trying to stay employed. Let me just also mention as far as Dr. Hurt. He's a county medical examiner. Now, not only did the ALJ not mention Dr. Nicholson, who is a medical opinion, treated or not, the ALJ didn't address that, didn't address what weight you give to Dr. Nicholson, didn't address who he was, was he treated, what the relationship was. I can't understand what he really did. Can you tell me why it's not clear? It gives weight to the therapist's opinion. Weight because his name is on it? We don't know what he did, whether he ever interacted with the patient or not. I think it's a reasonable assumption at least that he's a supervising psychiatrist over the therapist. Isn't he really the doctor prescribing the medicine? He's got somebody working with him who's the counselor. That's a typical medical practice. That's correct, but you have to assume there's some interchange between the therapist and the psychiatrist, and he's not going to sign the record. He's not going to sign the two letters he did unless there's some agreement. You have to assume, but there's no evidence of that? Well, correct, other than the fact he signed it. But is it a record prescribing medication? Pardon me? Is there something in the record that indicates what position she's taking medication? I believe the medication is being prescribed by Dr. McArthur. Not the other doctor? No. Okay. Getting back to Dr. Hunt, the county medical examiner, he approved the disability for her, for the county. Now, the commissioner argues, well, that was just a rubber stamp to Dr. McArthur. But if you look on the record, page 393 of the record, Dr. McArthur's office note of December 3, 1997, Dr. McArthur says, I told her about Dr. Hurt's call. Apparently they were going to have a meeting to decide on her medical retirement. So Dr. Hurt did not just rubber stamp Dr. McArthur. She consulted with Dr. McArthur. And that also, the social security regulation provides that a decision of a county to provide decisions by other government agencies must be considered. That is mandatory. That the ALJ consider the decision by the county to give her a disability retirement. That wasn't done. Counsel, I see your red light is on. Yes. You're called to the room to say your rebuttal. Thank you, Your Honor. Okay. Mr. Martin. Good morning. May it please the court, John Martin on behalf of the acting commissioner of social security. It sounds to me like the court understands this case pretty well and is very well prepared on it. A couple points I do want to make. One is throughout the briefs there's kind of confusion about Dr. Nicholson's role. Dr. Nicholson, I think I heard my opponent refer to him as a psychiatrist today. He's not a psychiatrist. He's a psychologist. And it says that right below his signature, William M. Nicholson, Ph.D., licensed psychologist. So he would not be prescribing any medications anyway. Thank you, Your Honor. And I made a mistake. There is a report from Dr. John Marshall in this case. Yes. He's the state agency reviewer. He's really legal, and he did an evaluation in 2007. So it's relative in terms of when this case would have gone for the AFJ, relatively recent. And he does say that the claimant could do a normal workday. Right? Yes. But there's limitations, the kind we're talking about as far as low stress, leg work, and the little interaction. Yes. So really your case, the AFJ's decision is premised on this doctrine. Do you agree? I would agree with that, Judge. And I would also say that I think the ALJ did his own evaluation. If you read the hearing, the ALJ very convincingly or thoroughly questioned her about the job that she had for the Bay County Medical Department. And what the ALJ did and what the ALJ is charged with doing is a residual functional capacity assessment. And so the ALJ looked at this person and said, here's a person who worked successfully or maybe not so successfully but at least kept a job with the same employer for 15 years. And it was a semi-skilled job. So the ALJ said, let's knock her down to an unskilled job. And she concluded that that kind of work was no longer performed by the claimant. Right. She had to look at other work with less stress, basically. Right. And the ALJ also said she did a job that was rather, the way she described it, chaotic. In the hearing she described the day she left the job and went to see Dr. Nagarkar in very great detail. And so the ALJ said, look, she had a rather chaotic job. Let's give her a job that's relatively stable, a low-stress job. That's in the residual functional capacity assessment. But all these are narrowing the range of employment as we go through each of these factors. Right. And that's why another point that I think I saw the court understanding very well is the psychologists have given these, or I'm sorry, the psychiatrists and the therapists have given these opinions that really don't tell us anything. They just say she can't do anything. And that's, I think, where a part of the analysis is missing on Ms. Engenbrecht's part, is that the system has a vocational expert appear at the hearing. And the vocational expert is the person who knows what jobs can be available for a claimant. And so what the ALJ did was the ALJ set out this residual functional capacity that had all those components that you talked about in it and then said, here's this person that's limited to unskilled work, minimal interaction with coworkers and supervisors, no public contact. And the vocational expert said this person can do some jobs. I'm sorry. I'm saying that 99% of the jobs in America this woman can't perform because of psychiatric issues. Everybody thinks she's pretty sick. The question is, can she do a low-skill, low-stress job with little supervision and no contact with coworkers? Right. And her therapist, it needs to be precise, says she can't. The consultative doctor says she can't. And that's what the ALJ has to resolve. Yes, that's exactly correct. The consultative examiner, the state agency reviewer, Dr. Dr. Marshall, is the one who's subpoenaing and talking about there. That is kind of the conflict. But it's also the ALJ is charged with developing a residual functional capacity assessment. That's what he did. He posed that to the vocational expert. The vocational expert said there are jobs this person can do. And that's why we feel this decision should be affirmed, just as the magistrate judge did in a very exhaustive decision. The plaintiff objected to that magistrate judge's report. The district court judge wrote a rather brief decision, but still considered those objections and affirmed it. And that's why we're asking the court to affirm it. If you have no more questions. Thank you. Thank you. Thank you very much. Do we have any other questions? Just briefly, Your Honor, you mentioned the concept of a harmless error. But I think there are several errors here that have a cumulative effect. I didn't get to mention the consultative evaluation by Dr. Plummer, by the Disability Determination Service. Dr. Plummer's report was done March 23, 1998. And he says this patient has a great deal of difficulty with on-job performance and performing within the time limits. A great deal of difficulty – well, okay. She needs a great deal of time in assembling simple items. The RFC, the residual functional capacity, said she can do simple work. Dr. Plummer's consultative evaluation says if she's going to do simple work, she needs a great deal of time to do simple work. Simple work, factory work, putting something together, you're not allowed a great deal of time. If you're taking a great deal of time to do simple work, you're in a sheltered workshop. Whether that has any weight or not, Your Honor, we don't know because the ALJ did not make any reference other than citing the exhibit number for Dr. Plummer's assessment. The commissioner argues, well, that was just taken in terms of simple work. But there are several limitations in Dr. Plummer's report. That is, there are some significant limitations, including the limitation of questioning the ability of whether she can do simple work or not. My review report indicates she won't be able to do simple work. But the ALJ did not consider or address Dr. Plummer's report. He did not consider or address Dr. Hurt's evaluation and recommendation she begin accounting for disability. He did not consider the fact that the county granted her disability, which is something that is mandated. So if you're talking about harmless error, you're talking about death by a thousand cuts. All of these things are things the judge should have considered. Especially with all of these things, Plummer hurt county disability to support the opinion of the treating psychiatrist and the treating therapist, who all give the opinion that this individual cannot do any work, given her substantial limitations. Thank you, Your Honor. All right, thanks to both of them for your helpful oral arguments. We appreciate it. The case will be submitted. We hope to manage on court.